UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

KELLY D. HELM,                          )
                                        )
                Plaintiff,              )
                                        )
        v.                              )          Case No. 3:09-CV-546 JD
                                        )
ANCILLA DOMINI COLLEGE,                 )
                                        )
        Defendant.                      )

**MEMORANDUM OPINION AND ORDER**

On November 20, 2009, the plaintiff, Kelly D. Helm ("Helm"), filed a complaint in this court

alleging discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964, as

codified at 42 U.S.C. § 2000e. [DE 1]. On January 11, 2010, defendant Ancilla Domini College

("Ancilla") filed its answer. [DE 5]. The parties proceeded through discovery and on November 19,

2010, Ancilla moved for summary judgment against Helm's complaint in its entirety. [DE 16]. On

December 20, 2010, Helm filed her response, and Ancilla replied on January 6, 2011. [DE 20; DE

26]. The motion is ready for a ruling.

The court separates its analysis of the discrimination and retaliation claims. Within its

discussion of Helm's discrimination claims, the court individually considers her allegations of

discrete acts of disparate treatment, her allegation of a hostile work environment, and her allegation

of constructive discharge. In contrast, Helm's retaliation claims are considered jointly so as to avoid

undue repetition. After considering the pleadings and the parties' arguments in light of the evidence

submitted, the court concludes that summary judgment is appropriate against all claims presented

in the complaint and instructs the clerk to enter judgment in the defendant's favor.

**FACTUAL BACKGROUND**[1]

When ruling on a motion for summary judgment, the Court construes all facts in the light most favorable to the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Here, that means the Plaintiff, and all reasonable and justifiable inferences are drawn in her favor. *Id.* The vast majority of the following facts are undisputed, but where some dispute or confusion does exist, the court has attempted to highlight it. Nonetheless, the inclusion of a fact in this section does not mean that it was material to the Court's ruling on this motion. To the contrary, many of these facts prove immaterial. This section is simply intended to provide a comprehensive background of the case and of the evidence presented to the Court.

Ancilla College is a 2-year liberal arts college located in Donaldson, Indiana. [DE 19-22 at ¶ 2]. In December 2003, Ancilla hired Kelly Helm as a part-time recruiting coordinator. [DE 19-1 at 3]. Specifically, Helm was hired to recruit student-athletes to the new volleyball team slated to compete during the 2004-05 academic year. [DE 19-1 at 7-9]. Helm discharged her duties satisfactorily and in the following academic year, 2004-05, she was employed as athletic academic coordinator/head women's volleyball coach/assistant professor of biology with a salary of $31,500.00. [DE 19-1 at 8-9; DE 19-4]. The next two academic years, 2005-06 (again at an academic year salary of $31,500.00) and 2006-07 (at an academic year salary of $32,445.00 or $33,418.00, perhaps representing a mid-year raise), Helm was employed as a half-time assistant professor of biology and as head women's volleyball coach. [DE 19-1 at 9-11; DE 19-5; DE 19-6]. Throughout Helm's tenure at Ancilla, she was employed through at-will agreements subject to yearly renewal. [DE 19-4; DE 19-5; DE 19-6; DE 19-8; DE 19-10; DE 19-15 at 4].

---

[1] The record is cited in the following format: ["Docket Entry Number" at "page or ¶ number within docket entry"]. No internal page or line numbers will be referenced.

Since July 1, 2006, Dr. Ronald May has served as Ancilla's president. [DE 19-22 at ¶ 2]. During the 2006-2007 academic year, Dr. Julianne Maher served for one year as Ancilla's Interim academic dean. [DE 19-23 at ¶ 2]. As part of her duties, Maher was expected to prepare for an upcoming accreditation review by the Higher Learning Commission ("HLC") of the North Central Association of Colleges and Schools. She spent time during the fall semester of 2006 checking the academic backgrounds of Ancilla's faculty members to ensure that they had the necessary qualifications and credentials to teach the subjects to which they were assigned. [DE 19-23 at ¶ 5]. After receiving a file update, including an undergraduate transcript, from Helm, Maher became concerned that Helm was not qualified to teach Anatomy & Physiology.[2] Rather than a degree in Biology or Anatomy & Physiology, Helm had degrees in Physical Education and Health & Human Performance. [DE 19-1 at 14-17]. Maher told Helm that, in light of her qualifications, she might be better off teaching Physical Education or Health. [DE 19-1 at 16].

The following March, Helm did not receive her reappointment letter at the usual time. [DE 19-1 at 19-21; DE 19-5; DE 19-6]. She met with Dr. May in late March or early April to discuss the reasons why. [DE 19-1 at 20, 23]. May informed Helm that a reappointment letter for the following academic year would be forthcoming, but that she would no longer be considered faculty. [DE 19-1

---

[2] Dr. May later indicated that Ancilla was using a document entitled "Commission Guidance on Determining Qualified Faculty," to assess the appropriateness of teaching assignments. [DE 19-22 at ¶ 7; DE 19-22 at 11-13]. The first page of this document states that,

> Faculty teaching in undergraduate programs should hold a degree at least one level above that of the program in which they are teaching, and those teaching general education courses typically hold a master's degree or higher and should have completed substantial graduate coursework in the discipline of those courses.

[DE 19-22 at 11].

at 27]. Faculty taught twenty-seven credit hours per academic year, whereas Helm taught only ten.[3] [DE 19-1 at 21-22]. May also indicated that he was interested in developing an exercise science curriculum at Ancilla and wanted Helm to research similar programs at other colleges and universities. [DE 19-1 at 24-27]. But because Helm would no longer be considered "faculty," she would not have to sit on faculty committees, serve as the faculty advisor to the athletic committee, or attend faculty senate meetings. [DE 19-1 at 26-27].

On May 15, 2007, Helm met with Maher to discuss her teaching assignments for the following year. [DE 19-1 at 32; DE 19-23 at ¶ 7; DE 19-23 at 12]. Maher reminded Helm that she was not qualified to teach biology courses. [DE 19-1 at 33; DE 19-23 at 12]. The two also agreed that there was a need for a new academic program in the area of exercise science or health and fitness. [DE 19-1 at 34; DE 19-23 at 12]. Nevertheless, Helm's teaching assignment for the fall 2007 semester remained unresolved. [DE 19-1 at 35; DE 19-23 at 12]. Following the meeting, Maher sent an email to May recommending that Helm be released from her teaching duties in the fall in order to develop the new program and that Helm's teaching assignment be deferred to the Spring semester. [DE 19-23 at 12]. On May 22, 2007, Helm sent Maher an email confirming her understanding that she would be assigned the responsibility of designing a new exercise science and wellness program for the college. [DE 19-7].

On May 31, 2007, May sent Helm a reappointment letter for the 2007-08 academic year as both a part-time faculty member in the Division of Science, Mathematics, and Information

---

[3] Helm remembers May stating that faculty taught twelve credit hours and she taught only ten. Ancilla's faculty handbook instructs that full-time faculty members teach 27 credit hours each year, up to three of which may be taught in the summer. [DE 19-15 at 8]. As a result, May's statement, as recalled by Helm, should probably be understood as indicating that full-time faculty were required to teach twelve credit hours *per semester*. Helm's letters of agreement indicate that she taught 10 credit hours per *academic year*, or less than half of a full course load. [*See, e.g.*, DE 19-6 at 2].

Technology and the head women's volleyball coach. [DE 19-8 at 2]. The salary offered in that letter was at the annualized rate of $33,418.00 for the first six months and $34,421.00 for the second six month period of the appointment. [DE 19-8 at 2]. Helm did not sign this appointment letter. [DE 19-1 at 40-41; DE 19-8 at 2]. Instead, on June 7, 2007, Helm met with May again to discuss why the reappointment letter referred to Helm as a "part-time faculty member" instead of "assistant professor" like her previous appointment letters. [DE 19-1 at 40-42; DE 19-4 at 2; DE 19-5; DE 19-6; DE 19-8]. On June 12, 2007, May emailed his response, stating that he offered her the part-time faculty appointment because her teaching responsibilities were less than half of a full time teaching load. [DE 19-22 at ¶¶ 8-9; DE 19-22 at 15]. In addition, May asked her to sign the May 31 appointment letter and return it to his office by June 15, 2007. [DE 19-22 at 15]. Helm replied the following day asserting that she wanted to maintain her assistant professor rank. [DE 19-22 at 15-16].

On June 14, 2007, May sent Helm an e-mail response explaining that ranked full-time faculty are those who have a full-time faculty contract and hold academic rank of professor, associate professor, assistant professor or instructor and that full-time faculty status is defined as teaching 27 credit hours per academic year. [DE 19-22 at 14]. Based on these definitions, May informed Helm that he was willing to modify the May 31 appointment letter to give her the title of "adjunct assistant professor" because that title seemed to match the services she had actually performed at Ancilla. [DE 19-22 at 14]. But he reiterated that her teaching assignment would have to be modified to include courses that matched her credentials, which is why, he added, he had asked Maher to talk with her about researching the feasibility of offering a concentration in exercise science. [DE 19-22 at 14]. On June 15, 2007, Helm replied with an e-mail indicating that she would sign an appointment

letter with the adjunct assistant professor designation. [DE 19-22 at 14].

Accordingly, on June 18, 2007, May submitted a revised appointment letter to Helm changing her academic title to "adjunct assistant professor of Health and Exercise Science in the Division of Science, Mathematics, and Information Technology" for the 2007-2008 academic year. [DE 19-1 at 45-48; DE 19-10]. The revised letter also included her appointment as women's head volleyball coach. Except for the title change, the salary and all other terms remained unchanged from the May 31, 2007 appointment letter. [DE 19-10]. Helm signed the revised appointment letter on June 20, 2007. [DE 19-1 at 45-48; DE 19-10].

On July 20, 2007, Dr. Joanna Blount, who had replaced Maher as academic dean at Ancilla, held a meeting with Helm. [DE 19-1 at 56-57; DE 19-19]. Blount wanted to address a conversation Helm had with the athletic director, Gene Reese, earlier in the month. [DE 19-1 at 49, 52, 56-58, 61]. More specifically, Helm had informed Reese that her contract no longer required her to serve as athletic academic coordinator. [DE 19-1 at 49, 52, 56-58, 61]. The statement was based on her meeting with May in late March or early April, in which he told her as much. [DE 19-1 at 26-27, 51-52, 60-61]. The academic athletic coordinator was responsible for keeping a record of student-athletes' attendance and grades and reporting them on a weekly basis to their respective coaches and to the athletic director. [DE 19-1 at 49-50]. When Helm told Reese that she would no longer be performing that function, he was "pretty angry" and went to see Blount. [DE 19-1 at 52].

Accordingly, during the meeting on July 20, Blount told Helm that the administration wanted to add the academic athletic coordinator position back into her appointment. [DE 19-1 at 54, 57-58; DE 19-19]. On August 7, 2007, Blount sent a letter to Helm referring to such addition. [DE 19-1 at 55-58; DE 19-19]. Enclosed with that letter was a document titled "Addendum to the Letter of Intent

for 2007-2008." [DE 19-1 at 56, 59; DE 19-19]. The addendum provided for her reappointment as academic athletic coordinator for the 2007-2008 academic year. [DE 19-19 at 3]. It also included a space for Helm to sign and return it to Blount's office by August 15, 2007, but Helm never returned the signed original or a copy. [DE 19-19 at 3; DE 19-25].

Thereafter, Helm also learned of a change in the amount of the tuition reimbursement Ancilla would provide for the classes she was taking at Purdue University toward her doctoral degree. [DE 19-1 at 77-79]. Previously, Helm had paid her tuition to Purdue, turned in her receipt to Ancilla, and received a fifty percent reimbursement. [DE 19-1 at 77-79]. However, Ancilla was under no contractual obligation to provide such a benefit. None of Helm's letters of appointment made any mention of tuition reimbursement. [DE 19-4; DE 19-5; DE 19-6; DE 19-10]. Although Ancilla's Faculty Handbook provided tuition remission as a benefit for Ancilla's full-time faculty members and their immediate family members, this only applied to courses at Ancilla. [DE 19-15 at 9-10].

Helm's tuition for doctoral courses at Purdue was being reimbursed out of Ancilla's faculty development fund, which was intended to assist faculty members in enhancing their qualifications for teaching their assigned courses at Ancilla. [DE 19-22 at ¶ 5]. May and Blount were concerned by their discovery that the doctoral courses Helm was taking at Purdue were in health and kinesiology, instead of biology or anatomy, and would not make her more qualified to teach Anatomy & Physiology, the course she had been assigned to teach for the past three academic years. [DE 19-22 at ¶ 6]. Thus, on August 16, 2007, May sent a memo to Helm informing her that, on the Blount's recommendation, he had approved allocating no more than $1,854 of faculty development funds to support her study at Purdue for the next academic year. He further informed her that Ancilla would not provide additional financial support beyond the $1,854 reimbursement payment that was

tendered to Helm on that date. [DE 19-1 at 77; DE 19-22 at ¶ 6; DE 19-11]. This represented a small decrease in Helm's tuition reimbursement. Over the course of the previous two academic years, she had received $4,357 in reimbursements from Ancilla. [DE 19-1 at 78]. The change from approximately $2,178.50 per academic year for the previous two years to $1,854 for the 2007-2008 academic year represented a net decrease of approximately $324.50 in external tuition benefits.

On August 29, 2007, May called Helm, Blount and Reese into a meeting in his conference room. [DE 19-1 at 62]. May had Helm's resume and transcripts in his hand, and he began the meeting by asking Helm to tell him and the other administrators about her background and education. [DE 19-1 at 62-63]. Then May read from a document which he "waved in front of [Helm's] face" but did not show her. [DE 19-1 at 66-67]. Helm does not know what the document was, but in the notes she prepared immediately after this meeting she referred to it as a "memo."[DE 19-1 at 66-69; DE 19-21]. May then read the signed June 18, 2007, revised appointment letter aloud. [DE 19-1 at 68]. Thereafter, Helm reminded him of their conversation (in late March or early April) in which he had told her she was not required to continue performing the athletic academic coordinator function or to attend faculty committee meetings. [DE 19-1 at 26-27, 69; DE 19-21]. Frustrated by what she considered to be May's "repeated rude and insulting tones and gestures and words and silly childish questioning[,]" Helm began weeping "to release her aggression and anger toward the stupidity of [the] meeting." [DE 19-1 at 88-89; DE 19-21]. May pointed out that Helm had cried at some point in every meeting he had held with her except for one. [DE 19-22 ¶ 12]. According to Helm, he suggested that she needed to seek professional help, or something to that effect. [DE 19-1 at 86-87].

On August 29, 2007, Blount delivered a letter to Helm along with a second addendum. [DE

19-1 at 56, 61; DE 19-20]. In addition to confirming the re-addition of the academic athletic coordinator position to her appointment letter, as discussed in the first addendum, dated August 7 [DE 19-19], the August 29 addendum included a brief description of the components that should be included in the feasibility study regarding the need for a program in Exercise Science. [DE 19-20]. The letter accompanying the addendum also confirmed that the feasibility study would "serve in lieu of her teaching assignment for fall term." [DE 19-20]. The letter asked that Helm sign the August 29 addendum and return it to Blount by September 5, 2007. [DE 19-20]. Like the August 7 addendum, Helm did not sign and return this addendum to Blount. [DE 19-1 at 79-80; DE 19-25 at ¶ 5]. Instead, on September 5, 2007, Helm delivered her letter of resignation to May's office. [DE 19-12]. The letter stated that she was resigning from both her duties as an assistant professor and as head volleyball coach, effective November 30, 2007. She made November 30 the effective date of the resignation "because effectively that was when the volleyball season was over." [DE 19-1 at 82-83; DE 19-12]. May accepted her resignation in a letter dated the same day. [DE 19-1 at 82-83; DE 19-13]. Helm has explained that she decided to resign instead of attempting the feasibility study because she was in the final stages of her dissertation, was in the middle of a volleyball season with a grueling travel schedule in which she had to drive the bus, was driving to Purdue to do research for her doctoral dissertation and had a family. [DE 19-1 at 80-81].

Nonetheless, Helm filed a Charge of Discrimination with the EEOC on June 10, 2008, over nine months later, alleging that she was "coerced into submitting" the September 5, 2007, resignation letter. [DE 19-1 at 83-85; DE 19-14]. In addition, Helm's EEOC charge indicated that she was subjected to "sexually condescending and sexually harassing words and actions by Ancilla, through . . . May, which created and perpetrated the sexually hostile work environment which forced

[her] into the resignation…." [DE 19-14]. The EEOC issued a right-to-sue notice on August 27, 2009. On November 20, 2009, Helm filed the instant suit in this court. The sexual harassment claim from the EEOC charge did not make it into the complaint, but the general discrimination and retaliation disparate treatment claims did. [DE 1 ¶ 10]. These were bolstered by hostile work environment and constructive discharge allegations. When asked at her deposition what "sexually harassing words and actions" she was subjected to that inspired her harassment complaint in the EEOC charge, Helm identified only May's suggestion at the August 2007 meeting that she needed to seek help. Helm explained that she believes May's comment was sexually harassing because she doubted that May would insult any male coach or professor at Ancilla by stating in front of peers that he needed professional help. [DE 19-1 at 86-87]. But she admitted that May did not use any profane language, curse, or saying anything sexually provocative in the August 2007 meeting. [DE 19-1 at 73]. When asked what she meant by "a hostile work environment" in the complaint, Helm identified only two occurrences: (1) the meeting with May in August 2007 which was also attended by her supervisors Blount and Gene Reese [DE 19-1 at 87]; and (2) the fact that, subsequent to that meeting, when May saw Helm walking down the hall he would often turn away and avoid her [DE 19-1 at 81-82]. The cause is now before the court on Ancilla's motion for summary judgment. [DE 16].

### STANDARD OF REVIEW

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 922 (7th Cir. 2001). A "material" fact is one

identified by the substantive law as affecting the outcome of the suit. *Anderson*, 477 U.S. at 248. A "genuine issue" exists with respect to any such material fact, and summary judgment is therefore inappropriate, when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id*. On the other hand, where a factual record taken as a whole could *not* lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)).

In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party, as well as draw all reasonable and justifiable inferences her favor. *Anderson*, 477 U.S. at 255; *King v. Preferred Technical Grp.*, 166 F.3d 887, 890 (7th Cir. 1999). Still, the non-moving party cannot simply rest on the allegations or denials contained in its pleadings. It must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986); *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). Furthermore, the non-moving party may rely only on admissible evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009).

## DISCUSSION

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against an employee "with respect to [her] compensation, terms, conditions, or privileges of employment" because of her "race, color, religion, sex, or national origin" or because she "opposed any practice made an unlawful employment practice . . . [or] made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing[.]" 42 U.S.C. § 2000e-2(a)(1); § 2000e-

3(a). Helm accuses Ancilla of running afoul of Title VII's prohibitions in two respects. First, Helm argues that Ancilla discriminated against her by subjecting her to several discrete instances of disparate treatment, a hostile work environment, and a constructive discharge because of her sex. [DE 1 ¶ 7, 9]. Second, Helm argues that Ancilla unlawfully retaliated against her. [DE 1 ¶ 9]. Helm does little to differentiate the factual bases for her discrimination and retaliation claims and as a result there is considerable overlap in the analysis of the two. But after carefully considering the pleadings and the evidence submitted, the court concludes that summary judgment must be granted in full.

## I.    Discrimination

Helm claims three types of discrimination based on her sex. She claims (I) that several discrete actions by Ancilla amounted to disparate treatment on the basis of her sex;[4] (II) that Ancilla subjected her to a hostile work environment because of her sex; and (III) that she was constructively discharged because of her sex.  Each claim is discussed in turn, and the court finds that Helm has not made a sufficient showing to withstand summary judgment with respect to any of them.

## A.    Disparate Treatment Claims

A plaintiff may pursue a claim of disparate treatment based on her sex under either the direct or indirect method of proof. Regardless of the method she chooses, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). But the two

---

[4] The court will refer to these as her "disparate treatment claims" for organizational purposes, but recognizes that as something of a misnomer. Technically, *all* of Helm's claims allege disparate treatment. But the court uses the term in this opinion to refer to those particular claims, based on discrete acts, which Helm seeks to prove with the familiar *McDonnell Douglas* model.

methods differ in terms of the showing that is necessary to survive summary judgment.

Under the direct method, the plaintiff seeks to prove a violation of the statutory text in the traditional way: she must produce either direct or circumstantial evidence that would permit a jury to infer that discriminatory intent motivated an adverse employment action taken against her. *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011) (citing *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 527 (7th Cir. 2008). "The conventional distinction [between direct and circumstantial evidence] is that direct evidence is testimony by a witness about a matter within his personal knowledge and so does not require drawing an inference from the evidence (his testimony) to the proposition that it is offered to establish, whereas circumstantial evidence does require drawing inferences." *Sylvester v. SOS Children's Vill. Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir. 2006) (citing 1 John H. Wigmore, Evidence § 25, at p. 953). There is no difference, in terms of probative value, between the two. *Id.* (citing *Anchor v. Riverside Golf Club*, 117 F.3d 339, 341 (7th Cir. 1997)). Case law attempts to list the types of circumstantial evidence the court should consider, *see, e.g.*, *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994) (suspicious timing, ambiguous oral or written statements, behavior towards other members of a protected group, tendency or statistical evidence, or contrasts with similarly situated employees), but these lists should not be read as exhaustive.[5] Rather, the court may and should consider *any* admissible evidence presented to it, whether direct or circumstantial, which tends to prove or disprove that the plaintiff's protected characteristic motivated the adverse employment action. Summary judgment must be denied if, taken together, that evidence is such that a reasonable jury could find that it did. *Anderson*, 477 U.S. at 248.

---

[5] Nor do cases like *Troupe*, which coined the familiar phrase "convincing mosaic of circumstantial evidence," create new standards of proof. *Sylvester*, 453 F.3d at 904.

Under the indirect, burden-shifting method the Supreme Court adopted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the plaintiff need not immediately produce direct or circumstantial evidence which, without more, tends to prove discriminatory intent. Instead, the plaintiff begins by establishing the four elements of a prima facie case by a preponderance of the evidence. *Kirk v. Fed. Prop. Mgmt. Corp.*, 22 F.3d 135, 138 (7th Cir. 1994) (citing *Burdine*, 450 U.S. at 252); *Jayasinghe v. Bethlehem Steel Corp.*, 760 F.2d 132, 134 (7th Cir. 1985). These elements vary according to the nature of the case and the discrimination alleged. Here, Helm must show: (1) she is a member of a protected class; (2) her performance met Ancilla's legitimate job expectations; (3) despite this performance, she was subjected to an adverse employment action; and (4) Ancilla treated similarly situated employees outside the protected class more favorably. *See Eaton v. Ind. Dep't of Corr.*, 657 F.3d 551, 554 (7th Cir. 2011) (citing *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 559 (7th Cir. 2007)). Each element may be shown by either direct or circumstantial evidence. *Desert Palace, Inc., v. Costa*, 539 U.S. 90, 91 (2003).

Once the plaintiff lays out a prima facie case, the burden shifts to the employer to offer a non-discriminatory reason for the adverse employment action. *Everroad v. Scott Truck Systems, Inc.*, 604 F.3d 471, 477 (7th Cir. 2010). The employer's burden at this stage is one of "production, not persuasion." *Reeves*, 530 U.S. at 142. If the employer meets its burden, the burden shifts back to the plaintiff to submit evidence demonstrating that the employer's explanation is a pretext. *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008). Pretext is not established when the plaintiff merely demonstrates the employer's reason was mistaken. *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006) (citations omitted). "An employer's mistaken belief that the plaintiff's conduct merited termination is not unlawful, so long as the belief was honestly held." *Id.* (citing

*Wade v. Lerner N.Y. Inc.*, 243 F.3d 319, 323 (7th Cir. 2001)). A pretext is a deliberate falsehood; a lie, and not an oddity or error. *Id*.

In this case, Helm does not argue the direct method. Instead, she explicitly acknowledges that her claim "is to be made" within the *McDonnell Douglas* framework. [DE 20 at 8]. "We cannot make a party's arguments for him, or force him to make arguments he seems determined not to raise." *Dynegy Mktg. and Trade v. Multiut Corp.*, 648 F.3d 506, 523 (7th Cir. 2011) (quoting *United States v. Foster*, 577 F.3d 813, 816 (7th Cir. 2009)). But even if the court could, Helm's concession is reflective of the record. She has not produced direct or circumstantial evidence sufficient to allow a reasonable jury to infer that any adverse employment action taken against her was motivated by a discriminatory intent.

Accordingly, the court turns to Helm's indirect method arguments. Ancilla concedes that, as a female, Helm belongs to a protected class. It also concedes that she performed her job satisfactorily. [DE 17 at 8]. The parties dispute Helm's ability to prove the third and fourth elements. With respect to the third, Ancilla argues, first, that several potential adverse actions identified by Helm are time-barred from the court's consideration and, second, that any remaining potential adverse decisions do not rise to the level considered actionable under our circuit's case law. With respect to the fourth element, Ancilla simply argues that Helm has failed to identify a similarly situated employee. The court finds that none of the adverse actions cited by Helm are sufficient to support a disparate treatment claim under Title VII, and for that reason summary judgment on her disparate treatment claim is appropriate. This conclusion is reinforced by Helm's inability to show that a similarly situated male employee was treated more favorably, or that Ancilla's stated reasons for each action taken against her were pretextual.

### 1.    Adverse Employment Actions

Because Title VII only prohibits illegally-motivated actions relating to the "compensation, terms, conditions, or privileges of employment," a Title VII plaintiff must show that she suffered a "materially adverse employment action." *De la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 685 (7th Cir. 2008) (citing *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)); *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (citing *Lewis v. City of Chi.*, 496 F.3d 645, 652-53 (7th Cir. 2007)) (disparate treatment plaintiff must show materially adverse action under either direct or indirect method of proof); *Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 924 (7th Cir. 2007) (retaliation plaintiff must show materially adverse action under either method of proof). A materially adverse employment action is more than "an inconvenience or a change in job responsibilities." *Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 649 (7th Cir. 2011) (quoting *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004)) (internal quotation marks omitted). Rather, to qualify as a change to "terms, conditions, or privileges of employment" within Title VII's meaning, an employment action must have an impact on plaintiff's job "in a real and demonstrable way." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238–39 (11th Cir. 2001). The change in the plaintiff's circumstances needs to be significant, although exactly what that means will vary according to the facts of a given case. *Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 744 (7th Cir.2002). The Seventh Circuit has provided some guidance:

> Adverse employment actions for purposes of the federal antidiscrimination statutes generally fall into three categories: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge.

*Barton v. Zimmer, Inc.*, 662 F.3d 448, 453-454 (7th Cir. 2011) (citing *Herrnreiter*, 315 at 744-45).

Determining whether any of the foregoing has occurred requires, of course, a case-by-case inquiry. "Sometimes whether an action is an adverse employment question is clear as a matter of law, but 'there are times where the question is not so obvious' such that it is a question of fact." *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394,  407 (7th Cir. 2010) (quoting *Lewis v. City of Chi. Police Dep't*, 590 F.3d 427, 436 (7th Cir. 2009)). That distinction increases in importance in the summary judgment context.

Out of the factual background, Helm, with help from Ancilla,[6] derives several potential adverse actions to support her disparate treatment sex discrimination claim. Specifically, she notes:

> (1) The May 31, 2007, proposed appointment letter for the 2007-2008 academic year naming Helm a "part-time faculty member in the division of Science, mathematics, and information technology" and the head women's volleyball coach, and offering a salary at an annualized rate of $33,418.00 for the first and $34,421.00 for the second six-month periods of the appointment [DE 19-8 at 2];
>
> (2) The June 18, 2007, revised proposed appointment letter for the 2007-2008 academic year changing Helm's title to "adjunct professor of health and exercise science," but not otherwise modifying the letter issued on May 31 [DE 19-10];
>
> (3) The August 7, 2007, addendum to the revised proposed appointment letter, which added "academic athletic coordinator" back to the list of Helm's duties [DE 19-19];
>
> (4) Ancilla's decision to assign Helm the responsibility of designing a new exercise science and wellness program for the college instead of her regular teaching schedule, which was formally memorialized in a second addendum dated August 29, 2007 [DE 19-20], but of which Helm was aware sometime before her own May 22, 2007, email discussing the reassignment [DE 19-7 at 2];

---

[6] Helm's brief claims that the complaint, specifically DE 1 ¶¶ 5-11, establishes that the alleged adverse employment actions occurred. [DE 20 at 8]. This is insufficient. At summary judgment, the non-moving party cannot simply rest on the allegations contained in its pleadings; it must present *evidence* to show the existence of each element of its case on which it will bear the burden at trial. *Celotex*, 477 U.S. at 322-323; *Robin v. Espo. Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). Fortunately for Helm, however, Ancilla provides record citations for all of the incidents in question.

(5) The August 16, 2007, memo from May to Helm explaining his decision to allocate no more than $1,854.00 of faculty development funds to Helm's tuition reimbursement [DE 19-11];

None of these occurrences can serve as the basis for a disparate treatment sex discrimination suit under Title VII. Any claim based on the first four is time-barred, and the reduction in Helm's tuition reimbursement was akin to the denial of a discretionary bonus payment. Helm has failed to show that she was subjected to a materially adverse employment action and, as a result, she has failed to make a prima facie case within the *McDonnell Douglas* framework.

> a. **Any allegations of discrimination or retaliation based on Ancilla's actions prior to August 16, 2007, are time-barred.**

Because Indiana is a "deferral state," meaning it has a state agency with enforcement powers parallel to those of the EEOC (in this case the Indiana Civil Rights Commission), Helm had 300 days from the date any alleged adverse employment action occurred to file a charge alleging a Title VII violation. *Laouini v. CLM Freight Lines, Inc.*, 586 F.3d 473, 475 (7th Cir. 2009); *see also* 29 C.F.R. § 1601.80.[7] Helm filed her charge with the EEOC on June 10, 2008. As a result, she may not

---

[7] It might not actually be that simple. Our circuit's case law on the Title VII filing deadline is in conflict. *See, e.g., Chaudhry v. Nucor Steel-Indiana*, 546 F.3d 832, 836 (7th Cir. 2008) ("[An EEOC] charge must be filed within 300 days after the alleged unlawful employment practice occurred or else the employee may not challenge the practice in court"); *but see Williamson v. Indiana University*, 345 F.3d 459, 463 (7th Cir. 2003) ("A claimant may file a charge of discrimination with the EEOC within a 180-day window permitted under Title VII"). The statute itself reads:

> A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency.

42 U.S.C. § 2000e-5(e)(1). A plain reading indicates that more is required to trigger the extended 300-day limitations

base her claim on any adverse action that occurred prior to August 16, 2007.

The court's next task is to determine which of the potential adverse actions occurred prior to that date. Actions (1)-(4), described above, each of which involved some forward-looking adjustment in Helm's title or duties at Ancilla, fall squarely within this category. Each is a discrete act which individually triggers the filing clock, as opposed to part of a continuing violation, *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) ("Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident . . . constitutes a separate actionable "unlawful employment practice.'"), and Helm was aware of each change in her status prior to August 16, 2007.

Nevertheless, Helm argues that these actions are not time-barred from serving as the basis for her suit. Because the consequences of these actions would not have been *felt*, she argues, until some time after August 16, 2007 – when the new semester and her new duties would have commenced – they did not "occur" for Title VII purposes until after the cut-off date. Helm's argument is contrary to federal precedent in this area. "[The] limitations period begins to run on the date that the defendant takes some adverse personnel action against the plaintiff, and not when the full consequences of the action are felt." *Davidson v. Indiana-American Water Works*, 953 F.2d 1058, 1059 (7th Cir. 1992) (citing *Delaware State College v. Ricks*, 449 U.S. 250, 258 (1980) (the

---

period than the bare fact that this suit arose in a "deferral state." Under the terms of the statute, it seems that a plaintiff must actually file with the Indiana Civil Rights Commission ("ICRC") in order to extend her EEOC filing deadline. EEOC regulations, however, do provide that when a local agency with jurisdiction, like the ICRC, waives its rights to an exclusive processing period for a certain type of charge, *see* 29 C.F.R. § 1601.13(a)(3)(iii), an EEOC filing is timely if "received within 300 days from the date of the alleged violation." 29 C.F.R. § 1601.13(a)(4)(ii)(A). The parties have not indicated to the court whether Helm ever filed a charge with the ICRC, or whether, in the alternative, the ICRC has waived its rights to an exclusive processing period for disparate treatment claims of this type. Absent these showings, a reading of the relevant statute and regulations indicates the 180-day limitations period might apply. Nevertheless, the case law does vary, and the parties have argued the case assuming a 300-day limitations period. [DE 17 at 4]. The court will proceed accordingly.

"proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts became most painful")(emphasis original)); *see also Chardon v. Fernandez*, 454 U.S. 6 (1981); *Librizzi v. Children's Mem'l Med. Ctr.*, 134 F.3d 1302, 1306 (7th Cir. 1998) (the limitations period "begins on the date the employee learns about the adverse decision . . . rather than when the financial consequences of the decision are felt."). It is undisputed that Helm learned of the first four potential adverse actions before the cut-off date. She is therefore barred by the statute of limitations from seeking any relief with respect to those employment decisions, and none can serve as the basis for her suit.[8]

> **b.    The reduction in Helm's tuition reimbursement was not a materially adverse employment action.**

The general rule is that "the denial of a monetary perk, such as a bonus or reimbursement of certain expenses, does not constitute an adverse employment action if it is wholly within the employer's discretion to grant or deny and is not a component of the employee's salary." *Tyler v. Ispat Inland Inc.*, 245 F.3d 969, 972 (7th Cir. 2001) (citing *Rabinovitz v. Pena*, 89 F.3d 482, 488-89 (7th Cir. 1996); *see also Fyfe v. City of Fort Wayne, Ind.*, 241 F.3d 597, 602-03 (7th Cir. 2001)). But a genuine inquiry into the facts and circumstances of the case is necessary to determine whether a tuition reimbursement was discretionary as opposed to the product of an entitlement. *See generally Breneisen v. Motorola, Inc.*, 512 F.3d 972, 980 (7th Cir. 2008). If the payment of the tuition reimbursement is not discretionary, and is instead part of the salary and benefits package to which

---

[8] The court is aware of the statutory exception to the *Ricks/Chardon* rule created by the Lilly Ledbetter Fair Pay Act of 2009, which, in effect, codified the paycheck accrual doctrine previously recognized by the Seventh Circuit. *See Groesch v. City of Springfield, Ill.*, 635 F.3d 1020 (7th Cir. 2011) (for an analysis of the Fair Pay Act's effect on the timing of paycheck discrimination claims); *see also Hildebrandt v. Illinois Dept. of Natural Res.*, 347 F.3d 1014 (7th Cir. 2003); *Reese v. Ice Cream Specialties, Inc.*, 347 F.3d 1007 (7th Cir. 2003) (for earlier statements of the paycheck accrual rule). But because Helm's claim is not a paycheck discrimination claim - in fact, her pay was *raised* by the alleged "demotions" - the Fair Pay Act is not relevant here.

an employee is contractually or otherwise entitled, then the denial of that reimbursement probably amounts to an adverse employment decision of the sort that can be actionable under Title VII. *Breneisen*, 512 F.3d at 980 (reversing a grant of summary judgment and the lower court's determination that tuition reimbursement was discretionary because, on the record available, the Seventh Circuit had no reason to think the reimbursement was not an entitlement); *see also Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 677 (7th Cir. 2011) ("[A] reduction in compensation is a materially adverse employment action.") (citing *Herrnreiter*, 315 F.3d at 744). But even in cases where the employee is entitled to a tuition reimbursement, a reduction that amounts to only a minimal change in the employee's total compensation probably is not *materially* adverse. *Breneisen*, 512 F.3d at 980 (". . . without some information as to the *amount of money involved*, we cannot conclude that the denial of reimbursement was not an adverse employment action or materially adverse action") (emphasis added); *see also Fyfe*, 241 F.3d at 602 (holding that the denial of a reimbursement of $156.89 was not a materially adverse employment action).

In this case, there are no factual disputes concerning the tuition reimbursement, and its payment was clearly discretionary. Ancilla's faculty handbook did provide for tuition remission for classes taken at Ancilla by full-time faculty members and their families, but Helm was never a full-time faculty member, as defined by the handbook, and she attended courses at Purdue rather than Ancilla. None of her letters of appointment ever mentioned tuition reimbursements as a part of her total compensation package, and the partial reimbursement of Helm's previous tuition expenses had only been achieved through the discretionary application of a separate and non-compensatory source: the faculty development fund, intended to assist faculty members in developing their credentials for the courses they taught. Helm had previously received faculty development funds

despite the fact that her course of study at Purdue was not in the fields she taught at Ancilla, and her superiors eventually became concerned about this use of resources.

Helm has produced no evidence indicating that Ancilla was somehow obligated to reimburse her, or to use faculty development funds on her education. She has only argued that Ancilla's decision to reduce or deny further reimbursement was materially adverse because it was permanent, rather than temporary. But if the payment of the reimbursement was discretionary in the first place, it makes no difference whether its denial was permanent or temporary. *See Tyler*, 245 F.3d at 972. Neither would be an adverse employment action. *Id*. The reimbursement was not an entitlement, nor was it otherwise non-discretionary. Its reduction is not actionable under Title VII. Finally, even if tuition reimbursement was a part of the total compensation package to which Helm was entitled, the total reduction amounted to approximately $324.50 for the next academic year. Considering the salary increase Helm was offered for the latter half of the upcoming academic year, this reduction would not have been appreciable, and the court would be hesitant to consider it "material."

### 2. Similarly Situated Employee

There is no doubt that the first four adverse actions Helm suggests are time-barred. But even if the fifth – the tuition reimbursement reduction – did amount to a materially adverse employment action, Helm's claim would fail because she has not shown that a similarly situated employee outside of the protected class was treated more favorably, *i.e.*, did not have their tuition reimbursement reduced. "Employees are similarly situated if they are directly comparable in all material aspects." *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006). Although the specific factors relevant to determining the comparability of employees will vary on a case-by-case basis, factors that the Seventh Circuit has found "especially helpful include whether the employees

'(i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications — provided the employer considered these latter factors in making the personnel decision.'" *Abuelyaman v. Ill. State Univ.*, ___ F.3d ___, 2011 WL 6188446 (7th Cir. 2011) (quoting *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir. 2003)).

Helm claims that her affidavit, at paragraph 18, establishes that a similarly situated male co-worker, Scott Reese, received more favorable treatment than she did. [DE 20 at 8]. The gist of the cited paragraph is that, while Helm was told her qualifications were incompatible with her existing teaching position, Reese, a man, was allowed to continue teaching without a master's degree. Helm makes no other arguments and introduces no further evidence on the similarly-situated issue. She does not show that Scott Reese held the same job description. She does not show that he was subordinate to the same supervisor. Nor does she show that he had comparable experience, education, or other qualifications to her own. More specific to this case, Helm has not even suggested that any male employee was receiving tuition reimbursements for classes taken at an external college or university, let alone that such an employee continued to receive those benefits while Helm's were reduced. It is Helm's burden to prove the elements of a prima facie case, *see Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 900-01 (7th Cir. 2005) (plaintiff has the initial burden of showing the four elements of a prima facie case), and she has failed to carry it here.

### 3.    Pretext Analysis

When a *McDonnell Douglas* plaintiff successfully makes a prima facie case, the burden shifts to the employer to offer a non-discriminatory reason for the adverse employment action. *Everroad*, 604 F.3d at 477. The employer's burden is one of "production, not persuasion." *Reeves*, 530 U.S. at

142. Thus, even if Helm had successfully made a prima facie case – and she has not – she would have to contend with Ancilla's proffered legitimate reason for its actions toward her: Ancilla was undergoing a sort of internal audit to prepare for an upcoming accreditation review with the HLC, and it discovered that Helm's credentials were not commensurate with the position she held. Dr. Maher substantiated Ancilla's rationale in her declaration, and it is further supported by Helm's own frequent admissions that the substance of her disputes with her superiors was, seemingly at all times, her qualifications to teach certain courses at Ancilla. [DE 19-23 ¶ 5]. Helm attempts to refute the foregoing with the affidavit of Dr. Charles LaFrance, the previous chair of Ancilla's Division of Science. [DE 23]. In LaFrance's opinion, Helm was perfectly qualified to teach her courses. But this difference of opinion does nothing to prove that Maher *did not actually believe* the justification she put forward – all it does is show that LaFrance believed something different. *See McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992) (issue of pretext "does not address the correctness or desirability of reasons offered for employment decisions[,]" but instead "addresses the issue of whether the employer honestly believes in the reasons it offers.") (citing *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 658 (7th Cir. 1991)). The only attack Helm aims at the *credibility* – as opposed to the accuracy – of Maher's statement is her repeated insistence that it is "patently DISSEMBLING [*sic*]". [DE 20 at 11]. In the vernacular, "patently dissembling" means obviously or unmistakably concealing one's true motives, feelings or beliefs. But the court sees nothing in the record to support such an attack on the facial believability of Maher's statement, which is logically coherent and consistent with representations made by Ancilla personnel repeatedly throughout the dramatic episodes underlying this case. Beyond that, Ancilla offers a pair of additional non-discriminatory reason for one of its "adverse" actions against Helm: it curtailed

her tuition reimbursement because it was being paid out of faculty development funds despite not being reasonably related to the purpose of that fund, and she was in her final semester of course work. Helm has done nothing to refute these rationales.

In short, none of the actions Helm invokes to support her Title VII disparate treatment sex discrimination claim was a timely, materially adverse employment action. Even if one was, Helm has not shown that a similarly situated male employee was treated more favorably. And even if Helm had passed both those tests, summary judgment on her disparate treatment claims would still be appropriate because she has not shown that her employer's stated reasons were pretextual. In short, summary judgment must be granted on Helm's claims of disparate treatment based on her sex.

## B. Hostile Work Environment Claim

Like disparate treatment, "unbearable changes in job conditions, such as a hostile work environment[,]" are actionable under Title VII when impermissibly motivated. *Barton*, 662 F.3d at 454. As a threshold matter, a hostile work environment is not actionable unless the hostility towards the plaintiff is so severe and pervasive that it alters the terms and conditions of her employment. *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 564 (7th Cir. 2009); *Henry v. Milwaukee Cnty.*, 539 F.3d 573, 586 (7th Cir. 2008) ("In order to establish a Title VII claim based on workplace harassment . . . [plaintiff] must prove that a reasonable person would find the alleged harassment to be so severe or pervasive as to create a hostile work environment, thus affecting the terms and conditions of employment."); *Mannie v. Potter*, 394 F.3d 977, 982 (7th Cir. 2005) ("A hostile work environment exists where an employee experiences harassment that is 'so severe or pervasive as to alter the conditions of employment and create an abusive working environment.'") (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998)). The statute prohibits nothing less. 42

U.S.C. § 2000e-2(a)(1) ("It shall be an unlawful employment practice . . . to discriminate against any individual with respect to his *compensation, terms, conditions, or privileges of employment . . .*") (emphasis added).

In order for her claim to rise to the requisite level, a plaintiff must show that her work environment was "both objectively and subjectively offensive – that is, 'one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Ellis v. CCA of Tennessee LLC*, 650 F.3d 640, 647 (7th Cir. 2011) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)). When determining whether the plaintiff has made the requisite showing, the court must cast a wide net and consider the totality of the circumstances. *Id*. The court should examine "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher*, 524 U.S. at 787–88, 118 S.Ct. 2275 (quotation marks omitted). Although Title VII certainly "comes into play before the offending behavior leads to a nervous breakdown[,]" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993), the offending conduct must be "severe or pervasive enough to cause psychological injury." *Ellis*, 650 F.3d at 647 (citing *Harris*, 510 U.S. at 22). It must be more than immature and ignorant. *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 546 (7th Cir. 2011) (citing *Shafer v. Kal Kan Foods, Inc.*, 417 F.3d 663, 665 (7th Cir. 2005)). It must be more than an isolated incident, and more than the result of personal or unexplained animosity, juvenile or boorish conduct, or simple teasing. *Id*. (citing *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840-41 (7th Cir. 2009); *Durkin v. City of Chi.*, 341 F.3d 606, 613 (7th Cir. 2003)). In short, it must amount to an "unbearable [change] in job conditions." *Barton*, 662 F.3d at 454.

Helm has not presented sufficient evidence of a hostile work environment to withstand summary judgment. Crediting Helm's version of events – as the court must on summary judgment – the conduct of which she complains occurred almost exclusively at the August 29, 2007, meeting. It consisted of some finger pointing, May waving a document at her, May being generally condescending, and May telling her she needed to seek professional help because she seemed to frequently end up in tears at conferences between the two. Thereafter, May avoided social contact with Helm when they passed each other in the hall. Helm's evidence might show that May was condescending and immature, even to the extent of humiliating Helm in front of co-workers. *See Faragher*, 524 U.S. at 787-88. It may even show that he carried some personal animosity toward her. But the offending behavior was limited almost entirely to an isolated incident and consisted primarily of pointed questions about her experience, qualifications, and mental stability. The Seventh Circuit has held that unpleasant critiques, even when repeated over a long period of time, do not create a hostile work environment. *Coffman*, 578 F.3d at 564 (criticisms of plaintiff's job skills and mental stability were not objectively demeaning, degrading, or hostile enough to support a hostile work environment claim). Under existing case law, the facts Helm presents, even construed in the light most favorable to her case, are not actionable[9] [10]

---

[9] The court notes that Ancilla characterizes Helm's claim of a hostile work environment based on her sex as a sexual harassment allegation, perhaps due to the inconsistencies between Helm's EEOC filings and her Complaint. [DE 17 at 2, 12; DE 26 at 8]. But the complaint contains no mention of sexual harassment, referencing only "gender-biased continuing discrimination." [DE 1 ¶ 7]. Furthermore, Helm's response brief characterizes May's words and actions at the August 29, 2007, meeting as evidence of a "hostile work environment," and "thus an additional instance of sexual/gender discrimination in the workplace," not as sexual harassment. [DE 20 at 19]. The distinction between a hostile work environment sexual harassment claim and a "simple" claim of a hostile work environment based on the plaintiff's sex is an important one. A sexual harassment plaintiff must show, *inter alia*, that "she was subjected to unwelcome conduct *of a sexual nature*" because of her sex. *Roby v. CWI, Inc.*, 579 F.3d 779, 784 (7th Cir. 2009) (emphasis added). In contrast, while a simple hostile work environment plaintiff must still eventually "demonstrate a link between the adverse treatment and her sex[,]"*Coffman*, 578 F.3d at 564, there is no requirement that the adverse treatment was of a sexual nature.

The court's reading of the record persuades it that Helm pleaded only a hostile work environment based on her sex before the court. She left the sexual harassment allegation raised in her unsuccessful EEOC filings behind.

Moreover, even if Helm *was* able to show the requisite level of hostility, she would still need to show that the hostility was based on membership in a protected class, *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002), and that there is a basis for imputing liability to Ancilla. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 764–65 (1998). While the latter requirement would probably be met, Helm has provided no evidence that May's words and actions toward her were based on her status as a woman. The only support in the record for drawing such a connection is Helm's statement at deposition that she doubted May would insult any male coach or professor at Ancilla by stating in front of his peers that he needed professional help. But this is unsupported speculation. It cannot, alone, save Helm's claim. Summary judgment against Helm's claim of a hostile work environment based on her sex is granted.

## C. Constructive Discharge Claim

"A constructive discharge," in some contexts, "constitutes an adverse employment action." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (citing *Pa. State Police v.*

---

But the court notes that, even if Helm *had* pleaded sexual harassment in this suit, the claim would not survive. This is because, as Ancilla rightly notes, Helm has made *no* showing of unwelcome conduct of a sexual nature. There is simply no evidence in the record that May, or anybody else affiliated with Ancilla, ever subjected Helm to "unwelcome sexual advances, requests for sexual favors or other verbal or physical contact of a sexual nature." *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002) (quoting *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998)) (internal quotation marks omitted). Any sexual harassment claim would therefore be subject to summary judgment.

[10] The court is aware that "[w]hen a plaintiff initiates a hostile work environment lawsuit, . . . she usually complains of an employer's *continuing violation* of Title VII 'based on the cumulative effect of individual acts.'" *Vance v. Ball State Univ.*, 646 F.3d 461, 468 (7th Cir. 2011) (emphasis added) (quoting *Morgan*, 536 U.S. at 115). The continuing violation doctrine "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period," but permits "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, ... for the purpose of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Morgan*, 536 U.S. at 105. This means that in determining whether a reasonable jury could find in Helm's favor on the hostile work environment issue, the court could have considered the cumulative effect not only of May's words and actions toward Helm at the August 29, 2007, meeting and thereafter, but of any similar actions taken previously during the course of Helm's employment, even if otherwise time-barred. *Dandy v. United Parcel Serv., Inc.*, 388 F.3d 263, 270 (7th Cir. 2004). But Helm has neither identified nor provided record evidence of any actions by Ancilla supporting her hostile work environment claim beyond the August 29, 2007, meeting and its aftermath.

*Suders*, 542 U.S. 129, 147 (2004)); *see also Barton*, 662 F.3d at 454. There are two elements to a constructive discharge claim: "First, a plaintiff needs to show that [her] working conditions were so intolerable that a reasonable person would have been compelled to resign. Second, the conditions must be intolerable because of unlawful discrimination." *Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 877 (7th Cir. 1999) (quoting *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 886 (7th Cir. 1998); *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir. 1996)); *see also Crystal Princeton Ref. Co.*, 222 NLRB No. 167 (Fed. 24, 1976) (first recognizing the elements of constructive discharge claim). But "[e]stablishing constructive discharge is more difficult than establishing a hostile work environment." *Ellis*, 650 F.3d at 650 (citing *Thompson*, 625 F.3d at 401-02). "To prevail on her claim of constructive discharge, [Helm] would have had to advance evidence 'even more egregious than that needed for a hostile work environment such that [s]he was forced to resign because [her] working conditions from the standpoint of the reasonable employee had become unbearable.'" *Overly v. KeyBank Nat'l Ass'n*, 662 F.3d 856, 864 (7th Cir. 2011) (quoting *Thompson*, 625 F.3d at 401-02); *see also Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 648 (7th Cir. 2005). "Thus, [Helm's] failure to advance evidence sufficient to find a hostile work environment claim also dooms her constructive discharge claim." *Id*. What's more, even if a constructive discharge occurred, Helm has produced no evidence indicating that it occurred because she is a woman. She has not made a prima facie case for either of the elements of a claim of constructive discharge based on her sex. *Simpson*, 196 F.3d at 877. Summary judgment must be granted.

## II.    Retaliation

Helm's retaliation claims are alleged pursuant to Title VII's prohibition against discriminating against an employee "with respect to [her] compensation, terms, conditions, or

privileges of employment" because she "opposed any practice made an unlawful employment practice . . . [or] made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing[.]" 42 U.S.C. § 2000e-2(a)(1); § 2000e-3(a). Helm has done little to clarify the factual basis for her retaliation claims or to distinguish them from her discrimination claims. In her complaint, Helm indicates that *all* of the "Ancilla adverse (and gender-biased) employment acts" alleged therein were also "retaliatory." [DE 1 ¶ 9]. But in her brief, she seems to limit her retaliation claims to Ancilla's refusal to assign Helm teaching duties for the 2007-2008 academic year and to its elimination of Helm's "continuing education subsidy." [DE 20 at 9].

Helm's conflicting statements of her retaliation claim make it difficult for the court to conduct a proper analysis. But, in this case, it makes no difference. Retaliation claims are analogous to discrimination claims under Title VII, and the tests for each share many common elements. For example, in order to establish a prima facie case of retaliatory disparate treatment under the direct method of proof, a plaintiff must establish that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action subsequent to her participation; and (3) there was a causal link between the adverse action and the protected activity. *Metzger v. Ill. State Police*, 519 F.3d 677, 681 (7th Cir. 2008) (citing *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir.2007)); *Burks v. Wis. Dep't of Transp.*, 464 F.3d 744, 758 (7th Cir. 2006). In order to prove a causal link, "the plaintiff is required to show that the employer would not have taken the adverse action 'but for' the plaintiff's engagement in the protected activity." *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 483 (7th Cir. 1996). Under the indirect method, a retaliation plaintiff must make the same four-part showing as she would in a discrimination case, except that she must demonstrate that she engaged in a protected act instead of showing that she is a member of a protected class. *See Silverman v. Bd.*

*of Educ. of City of Chi.*, 637 F.3d 729, 742 (7th Cir. 2011). Similarly, to show that a hostile work environment exists and is unlawfully retaliatory, the plaintiff must make the same showing as would be necessary to sustain a hostile work environment discrimination charge, except that she must show the hostility was based on her engaging in a protected act instead of on her membership in a protected class. The same goes for constructive discharge.

The similar path of analysis for discrimination and retaliation under Title VII means Helm's retaliation claims suffer from the same failings as her discrimination claims. She still cannot make a prima facie case pursuant to the *McDonnell Douglas* model, and she still cannot show a hostile work environment or a constructive discharge. For those reasons alone, summary judgment on Helm's retaliation claims must be granted. But the court also notes that Helm has not made any discernible effort to prove the only element that differs: that she engaged in a statutorily protected activity. The closest Helm comes is a suggestion that the curtailment of her tuition reimbursement was "issued in retaliation for Helm's refusal to submissively accept a demotion[.]" [DE 20 at 14]. But there is not a scintilla of evidence in the record that Helm opposed her change in title (accompanied by a pay raise) because she believed it was motivated by a discriminatory animus in violation of Title VII. Apparently conceding as much, Helm asks the court to "infer" retaliation, because inferences are to be drawn in the non-movant's favor at summary judgment. This is true, but an inference is a conclusion reached on the basis of evidence and reasoning. The plaintiff is not asking the court to draw an inference. She is asking the court to assume all of the elements of a retaliation case without developing any factual basis. At the summary judgment stage, that is a bridge too far.

**CONCLUSION**

The court has addressed every discrimination or retaliation claim for which there is a possible basis in the record and has found the plaintiff's case insufficient to withstand summary judgment on any point. Ancilla's motion [DE 16] is granted, and summary judgment against the plaintiff's complaint is **GRANTED** in full. The clerk is instructed to enter judgment for the defendant.

SO ORDERED.

ENTERED:   January 5, 2012

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court